# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO.:

**SECURITIES AND EXCHANGE COMMISSION,**

           **Plaintiff,**

v.

**JORDAN E. GOODMAN,**

           **Defendant.**

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff Securities and Exchange Commission ("Commission") alleges:

## INTRODUCTION

1. From approximately April 2014 through December 2017, Defendant, Jordan E. Goodman ("Goodman"), while associated with Knowles Systems, Inc. ("Knowles Systems"), acted as an unregistered broker for Woodbridge Group of Companies LLC and its affiliates ("Woodbridge"). Goodman, a self-described "media influencer" made frequent guest radio appearances nationwide touting the safety, security and earning potential of Woodbridge securities to unsuspecting investors. Goodman also touted Woodbridge's securities on the internet through his own website and Knowles Systems' website.

2. In reality, despite Goodman's assurances of the safety and security of the investment, Woodbridge was actually operating a massive Ponzi scheme, raising more than $1.2 billion before collapsing in December 2017 and filing for bankruptcy. Once Woodbridge filed for bankruptcy, investors stopped receiving their monthly interest payments, and have not received a return of their investment principal.

3. Goodman assisted Knowles Systems in raising approximately $147 million from the offer and sale of unregistered Woodbridge securities to more than 1,200 retail investors located in 38 states throughout the nation. For his efforts, Goodman was paid almost $2.3 million in transaction-based sales commissions and marketing fees.

4. Goodman did not disclose his compensation and in many instances misled investors to think he was not being paid transaction-based sales commissions. However, unbeknownst to Goodman's listeners and viewers, many of whom invested their retirement savings in Woodbridge securities through Knowles Systems, Goodman was receiving transaction-based sales commissions each time they invested in Woodbridge through Knowles Systems. Thus, through his communications, Goodman gave publicity to and circulated a communication which, though not purporting to offer Woodbridge's securities for sale, described them, for which Goodman received transaction-based sales commissions from an issuer or dealer, without fully disclosing the receipt of these sales commissions and the amount thereof.

5. At all relevant times, Goodman held no securities licenses, was not registered with the Commission, and was not associated with a registered broker-dealer. Further, Woodbridge's securities were not registered with the Commission nor did they qualify for an exemption from registration. Goodman was thus not permitted to sell or solicit the purchase or sale of securities.

6. By engaging in this conduct, Goodman violated Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)], Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)], and Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)]. Unless enjoined, Goodman is reasonably likely to continue to violate the federal securities laws. The Commission also seeks against Goodman

disgorgement of ill-gotten gains along with prejudgment interest thereon, and civil money penalties.

## DEFENDANT

7.     **Goodman,** 63, is a resident of Elmsford, New York, and is a self-described nationally-recognized expert on personal finance.  His website, MoneyAnswers.com, proclaims himself as "America's Money Answers Man."  He appears frequently on Fox News Network, Fox Business Network, CNN, CNBC and CBS.  For 18 years, Goodman was on the editorial staff of Money magazine where he served as Wall Street correspondent.  He is the author or co-author of 13 books on personal finance.  He is a frequent speaker at personal finance seminars held across the country.

## JURISDICTION

8.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)]; and Sections 21(d), 21(e) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a)].

9.     This Court has personal jurisdiction over the Defendant and venue is proper in the Southern District of Florida because several of Goodman and Knowles Systems' customers who invested a total of nearly $2 million in Woodbridge securities reside in the Southern District of Florida.

10.    In connection with the conduct alleged in this Complaint, Defendant, directly and indirectly, singly or in concert with others, made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

**FACTUAL ALLEGATIONS**

11. Beginning in July 2012 through at least December 4, 2017, Robert H. Shapiro ("Shapiro") and Woodbridge orchestrated a massive Ponzi scheme raising in excess of $1.22 billion from the sale of unregistered securities to over 8,400 investors nationwide. At least 2,600 of these investors used their Individual Retirement Account funds to invest nearly $400 million.

**A. Woodbridge's Securities and Representations to Investors**

12. Woodbridge sold investors two primary types of securities: (1) twelve-to-eighteen month term promissory notes bearing 5%-8% interest that Woodbridge described as First Position Commercial Mortgages ("FPCM Note" and "FPCM Investors"), which were issued by one of Woodbridge's several affiliated Fund Entities, and (2) seven different private placement fund offerings with five-year terms: (a) Woodbridge Mortgage Investment Fund 1, LLC; (b) Woodbridge Mortgage Investment Fund 2, LLC; (c) Woodbridge Mortgage Investment Fund 3, LLC; (d) Woodbridge Mortgage Investment Fund 3A, LLC; (e) Woodbridge Mortgage Investment Fund 4, LLC; (f) Woodbridge Commercial Bridge Loan Fund 1, LLC; and (g) Woodbridge Commercial Bridge Loan Fund 2, LLC; (collectively "Fund Offerings" and "Fund Investors").

**1. FPCM Notes**

13. Woodbridge represented that the FPCM Note was a "simple, safer and more secured opportunity for individuals to achieve their financial objectives." The purported revenue source enabling Woodbridge to make the payments to FPCM Investors was the interest Woodbridge would be receiving from mainly one-year loans to supposed third-party commercial property owners ("Third-Party Borrowers"). Woodbridge told investors that these Third-Party Borrowers were paying Woodbridge 11-15% annual interest for "hard money," short-term financing. Woodbridge would secure the debt through a mortgage on the Third-Party Borrowers'

real estate.  For example, Woodbridge wrote in marketing materials that "Woodbridge receives the mortgage payments directly from the borrower, and Woodbridge in turn delivers the loan payments to you under your [FPCM] documents."

14.     The FPCM Investors invested their funds with the expectation of earning the promised returns while maintaining a secured interest in a parcel of real estate.

15.     The profitability of the FPCM investments was derived solely from the efforts of Shapiro and Woodbridge and the investments were in a common enterprise.  Once investors provided their funds to Woodbridge, their funds were commingled with other investors' funds and used by Woodbridge for general business purposes.  Investors had no control over how Shapiro and Woodbridge used their money.  Because Woodbridge was a Ponzi scheme, its ability to pay returns depended upon its continued ability to raise funds from new investors and convince existing investors to rollover their investments.  Information materials from Woodbridge informed investors that it conducted all due diligence including title search and appraisal on the commercial property and borrower.  The investors played no role in selecting which properties would purportedly secure their investments.  Marketing materials from Woodbridge also reassured investors, telling them not to worry about borrowers failing to make their loan payments because Woodbridge would continue to pay investors their interest payments.

### 2. Fund Offerings

16.     Woodbridge offered the Fund Offerings to investors through one of its affiliated Fund Entities, pursuant to purported exemptions from registration under Rules 506(b) and (c) of Regulation D of the Securities Act, collectively seeking to raise at least $435 million from investors.  In the Regulation D filings, Woodbridge described the Fund Offerings as "equity" securities.

17. Woodbridge, in an attempt to avoid registration of its securities with the Commission, purportedly limited each of the Fund Offerings to accredited investors with a $50,000 minimum subscription and provided for a five-year term with a 6% to 10% aggregate annual return paid monthly to Fund Investors and a 2% "accrued preferred dividend" to be paid at the end of the five-year term and a share of "profits." Neither Woodbridge nor Goodman ensured that only accredited investors purchased the Fund Offerings (or the FPCMs).

18. In the offering memoranda for the Fund Offerings, Woodbridge represented to Fund Investors that their funds would be used for real estate acquisitions and investments, notably including Woodbridge's FPCMs. The Fund Offerings, in effect, were investments into pooled FPCMs. Many of these pools contained 40 or more investors.

19. Investors in the Fund Offerings invested in a common enterprise with the expectation of profit based on the efforts of others. The allegations of paragraphs 14 and 15 of this Complaint are applicable to the Fund Offerings as well.

20. The FPCM Notes and the Fund Offerings are securities within the meaning of Securities Act § 2(a)(1), 15 U.S.C. § 77b(a)(1), and Exchange Act § 3(a)(10), 15 U.S.C. § 78c(a)(10). Investors were unquestionably motivated by the high rate of returns that Woodbridge offered and investors viewed these as passive investments generating safe returns. Woodbridge sold the FPCM notes to a broad segment of the public (at least 8,400 investors) through general solicitations and there were no risk-reducing factors indicating the FPCM notes were not securities. Neither the FPCM Notes nor the Fund Offerings were registered with the Commission, and there was no applicable exemption from registration.

**B. Woodbridge's Misrepresentations**

21. Woodbridge's claim to be making high interest rate loans to "third party" borrowers was a lie. In reality, Woodbridge's business model was a sham. Investors' funds were used to purchase, in the name of a Shapiro controlled Limited Liability Company (LLC), almost 200 residential and commercial properties, primarily in Los Angeles, California and Aspen, Colorado. Thus, nearly all the "third-party" borrowers were Shapiro owned and controlled LLCs, which had no source of income, no bank accounts, and never made any loan payments to Woodbridge, all facts Woodbridge and Shapiro concealed from investors.

22. Because Shapiro's LLCs were not making any of the promised interest payments and Woodbridge's other revenue was minimal, Woodbridge sought to convince FPCM Investors to rollover their investment into a new note at the end of the term, so as to avoid having to come up with the cash to repay the principal. For the payment of returns to FPCM and Fund Investors and redemptions to FPCM Investors who did not rollover their notes, Woodbridge raised and used new investor funds, in classic Ponzi scheme fashion.

23. Finally, on December 1, 2017, after amassing more than $1.22 billion of investor money, with more than $961 million in principal still due to investors, Woodbridge and Shapiro missed their first interest payments to investors after purportedly ceasing their fundraising activities. Without the infusion of new investor funds, just days later, on December 4, 2017, Shapiro caused most of his companies to be placed in Chapter 11 Bankruptcy.

24. In the Chapter 11 Bankruptcy, Woodbridge, now under the control of independent management, took the position that the FPCM Investors do not have a secured interest in the property underlying their investment because they were required to perfect their interest pursuant to the requirements of the Uniform Commercial Code, which virtually none of the investors did.

7

### C. Woodbridge's Use of External Salespersons

25. Woodbridge recruited a network of several hundred external, mostly unregistered, sales agents, including Knowles Systems. Woodbridge provided sales agents with the information and marketing materials that they gave to FPCM and Fund Investors.

26. Woodbridge offered its FPCM notes to the sales agents at a 9% wholesale annual interest rate, who then would offer these notes to their investor clients at 5% to 8% annual interest rate—the difference representing the sales agents' transaction-based sales commissions.

27. For the Fund Offerings, the sellers such as Knowles Systems, which Goodman associated with, received a 5% sales commission that Woodbridge purposefully mischaracterized as a "marketing bonus" to avoid the appearance of paying transaction-based sales commissions.

28. Sales agents such as Knowles Systems encouraged their customers to rollover their investments at their term expiration, either into another 12-18 month FPCM note, or into a five-year Fund Offering. Sales agents received transaction-based sales commissions for rollovers, with a five-year Fund Offering rollover receiving a greater commission than a FPCM rollover.

### D. Goodman Touted and Participated in the Offer and Sale of Woodbridge's Unregistered Securities

29. For many years preceding the events alleged in this action, Goodman appeared on AM news radio stations throughout the country in weekly guest segments ranging from approximately 5 to 30 minutes long. He appeared on such stations as 850 KOA, Denver Colorado, 1120 KMOX, St. Louis, Missouri, 560 WHYN, Springfield, Massachusetts, and 720 WGN, Chicago, Illinois, amongst others.

30. Through his years of appearing on the radio, Goodman offered generalized advice and opinions on matters such as the stock and bond market, personal finance issues such as credit counseling, and various insurance products. Through his frequent radio and television

appearances, as well as his online presence and published books on finance, Goodman garnered the trust and respect of his listeners, many of whom were elderly.

31. However, beginning in 2014, Goodman began touting investing in commercial mortgage bridge loans in his radio and internet appearances. When appearing on the radio, listeners often inquired what they should be investing in, and whether they could earn better returns than the minimal interest they were receiving in their Individual Retirement Accounts ("IRAs").

32. Goodman, in describing Woodbridge's commercial mortgage bridge loans, walked investors through the key "facts": Third-party commercial borrowers, usually attempting to complete a project, could not get a traditional loan, so they would seek out high-interest loans. The listener could participate in the making of these high-rate loans, earning 6-8% aggregate annual interest, payable monthly, well in excess of what they were earning in their IRA. These loans were "safe and secure," because the listener would have a first position lien on the property the borrower had to pledge as collateral, and because the entity (Woodbridge) offering the commercial mortgage bridge loan had a fund worth millions of dollars set aside to refund lenders in the event the borrower defaulted.

33. Goodman exclusively referred listeners to Knowles Systems' website or its toll-free phone number to purchase Woodbridge's securities. Goodman consistently vouched for the trustworthiness of Knowles Systems and its principals.

34. However, throughout Goodman's radio and internet appearances, he did not disclose that he was receiving a 1% commission of the invested (or reinvested) funds in Woodbridge's securities.

35. During his radio and internet appearances, Goodman invited listeners to contact him directly to further discuss the investment in the commercial mortgage bridge loans. Investors

often did. In these follow-up email and/or telephonic communications with his listeners, Goodman, at times, reiterated that the investment was "super-safe," yielded 6% (or more) annual interest, payable monthly, and were finite in length, never lasting more than 24 months. Goodman touted the favorable loan-to-value ratio of the pledged properties, and noted that since the product "does not trade. . . your principal is always safe and you get your principal back when due." Goodman made clear to listeners how to invest, stating, "If you have an IRA or Roth IRA or SEP IRA or any other tax qualified plan, you can roll it over to a self-directed IRA and use the money to invest in the Mortgage Bridge program."

36. From approximately April 2014 through December 2017, Goodman assisted Knowles Systems in raising approximately $147 million from the offer and sale of unregistered Woodbridge securities to more than 1,200 retail investors located in 38 states throughout the nation. Goodman received approximately $2.3 million in transaction-based sales commissions and marketing fees based on these investors which he sourced to Knowles Systems through his radio and internet broadcasts and one-on-one email and telephone conversations.

## CLAIMS FOR RELIEF

## COUNT I

### Violations of Sections 5(a) and 5(c) of the Securities Act

37. The Commission repeats and realleges paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38. No registration statement was filed or in effect with the Commission pursuant to the Securities Act with respect to the securities offered and sold by Goodman as described in this Complaint and no exemption from registration existed with respect to these securities.

39. From as early as April 2014 and continuing through approximately December 2017, Goodman directly and indirectly:

   (a) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

   (b) carried or caused to be carried securities through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or delivery after sale; or

   (c) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security;

without a registration statement having been filed or being in effect with the Commission as to such securities.

40. By reason of the foregoing Goodman violated and, unless enjoined, is reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Violations of Section 17(b) of the Securities Act

41. The Commission repeats and realleges Paragraphs 1 through 36 of this Complaint as if fully set forth herein.

42. From as early as April 2014 and continuing through approximately December 2017, Goodman directly or indirectly, by using any means or instruments of transportation or communication in interstate commerce or by using the mails, published, gave publicity to, or circulated any notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, described such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter,

or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

43. By reason of the foregoing, Goodman, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate, Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)].

## COUNT III

### Violations of Section 15(a)(1) of the Exchange Act

44. The Commission repeats and realleges Paragraphs 1 through 36 of this Complaint as if fully set forth herein.

45. From as early as April 2014 and continuing through approximately December 2017, Goodman, directly or indirectly, by the use of the mails or the means or instrumentalities of interstate commerce, while acting as or associated with a broker or dealer, effected transactions in, or induced or attempted to induce the purchase or sale of securities, while he was not registered with the Commission as a broker or dealer or when he was not associated with an entity registered with the Commission as a broker-dealer.

46. By reason of the foregoing, Goodman, directly or indirectly, violated and, unless enjoined, is reasonably likely to continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests the Court find Goodman committed the violations alleged, and:

### A.
### Permanent Injunctive Relief

Issue a Permanent Injunction restraining and enjoining Goodman from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)], Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)], and Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

### B.
### Disgorgement and Prejudgment Interest

Issue an Order directing Goodman to disgorge all ill-gotten gains or proceeds received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

### C.
### Civil Money Penalties

Issue an Order directing Goodman to pay civil money penalties pursuant to Section 20(d) [15 U.S.C. § 77t(d)] of the Securities Act and Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] of the Exchange Act.

### D.
### Further Relief

Grant such other and further relief as may be necessary and appropriate.

# E.
# Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

December 18, 2018                                         Respectfully submitted,

By:     /s/ Russell Koonin & Christine Nestor
        Russell Koonin & Christine Nestor
        Senior Trial Counsel
        kooninr@sec.gov; nestorc@sec.gov
        FL Bar No.: 474479; FL Bar No. 597211
        Telephone: (305) 982-6385; (305) 982-6367

        /s/ Scott Lowry
        Scott Lowry
        Senior Counsel
        lowrys@sec.gov
        Special Bar ID # A5502400
        Telephone: (305) 982-6387

        Attorneys for Plaintiff
        **SECURITIES AND EXCHANGE COMMISSION**
        801 Brickell Avenue, Suite 1800
        Miami, Florida 33131
        Telephone: (305) 982-6300
        Facsimile:  (305) 536-4154